UNITED STATES of America,
Appellee,

v.

Frank QUATTRONE, Defendant–
Appellant.

Docket No. 04–5007–CR.

United States Court of Appeals,
Second Circuit.

Argued: July 12, 2005.

Decided: March 20, 2006.

Mark F. Pomerantz (John H. Longwell, Christopher Hyde Giampapa, Tina Samanta, Joshua Hill, and Barbara Llanes, Paul, Weiss, Rifkind, Wharton & Garrison, LLP; Andrew L. Frey, Andrew H. Schapiro, and Lauren R. Goldman, Mayer, Brown, Rowe & Maw LLP, New York, New York, on the brief), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant–Appellant.

David B. Anders, Assistant United States Attorney, Southern District of New York (David N. Kelly, United States Attorney, on the brief, Jessica A. Mordas and Harry Sandick, Assistant United States Attorneys, of counsel) New York, NY, for Appellee.

Before: WESLEY and HALL, Circuit Judges, and SCULLIN, Chief District Judge.[1]

WESLEY, Circuit Judge.

This case arose out of parallel investigations[2] of Initial Public Offering ("IPO") allocation practices alleged to have been employed by Wall Street investment-banking firms, including Credit Suisse First

---

**1.** The Honorable Frederick J. Scullin, Jr., Chief Judge, United States District Court for the Northern District of New York, sitting by designation.

**2.** The investigations took place in the Fall of 2000 and were conducted by the National Association of Securities Dealers ("NASD"), the Securities and Exchange Commission ("SEC"), and a grand jury empaneled in the Southern District of New York

Boston Corporation ("CSFB").[3] The investigations focused on allegations that allocations in forthcoming "hot issues"[4] were tied to the payment of inflated commissions for trades of highly liquid stocks on the secondary market. *E.g.,* J.A. 646 (Gov.Ex. 300).

Defendant was indicted for obstruction of justice and witness tampering in connection with the investigations. The indictment alleged three counts against Quattrone. Count 1 charged violations of 18 U.S.C. §§ 1503 & 2 for corruptly endeavoring to obstruct a grand jury proceeding, J.A. 45; Count 2 charged violations of 18 U.S.C. §§ 1505 & 2 for corruptly endeavoring to obstruct the SEC investigation, J.A. 45–46; and Count 3 charged witness tampering in violation of 18 U.S.C. §§ 1512 & 2 for knowingly and corruptly persuading or endeavoring to persuade others to withhold or destroy documents with intent to interfere with the proceedings, J.A. 46–47. The jury was unable to reach a verdict in Quattrone's first trial. The second resulted in a guilty verdict on all counts. The district court imposed a sentence of 18 months' imprisonment.[5]

On appeal, Quattrone challenges the sufficiency of the evidence of his intent, jury instructions on the elements of the crimes charged, certain evidentiary and trial-management decisions, and the sentence imposed. Because the jury instructions were erroneous, we VACATE the judgment and REMAND for a retrial. Further, in the interest of justice, we direct that the case be reassigned to another judge sitting in the United States District Court for the Southern District of New York.[6]

## Background

### A. Quattrone's Role as the Head of the Tech Group at CSFB

CSFB is a global, full-service investment banking firm. J.A. 100 (Tr. 621–22). In 2000, CSFB was principally divided into three business divisions—the Investment Banking Division ("IBD"), the Equity Division, and the Fixed Income Division. J.A. 100 (Tr. 623–24). IBD rendered financial services and advice to companies and governments. J.A. 100 (Tr. 621–22). J.A. 100 (Tr. 622). The Equity Division managed the purchase and sales of securities by CSFB in the public markets, including the New York Stock Exchange. J.A. 100 (Tr. 623–24).

In certain business areas, CSFB was further divided into groups within each division or into collaborative groups that performed functions that would otherwise be executed by more than one division. J.A. 100–01 (Tr. 624–26). As relevant

---

**3.** As a result of the SEC investigation, CSFB agreed to pay $100–million dollars to the SEC. *See SEC v. Credit Suisse First Boston Corp.,* 02 CV 00090(RWR), Litig. Release No. 17327 (Jan. 22, 2002), *available at* http://www.sec.gov/litigation/litreleases/lr17327.htm.

**4.** A "hot issue" is an IPO of a security for "which investor demand exceeds securities available in the issue." David L. Scott, Wall Street Words 180 (3d ed.2003); *see also Billing v. Credit Suisse First Boston Ltd.,* 426 F.3d 130, 139 n. 7 (2d Cir.2005) (defining "hot issue").

**5.** The district court also imposed concurrent two-year terms of supervised release for each

count and fines and assessments totaling $90,300.00.

**6.** We need not address Quattrone's challenges to the perjury sentencing enhancement or his Sixth Amendment claim, as those claims are now moot. Nor do we address Quattrone's mandamus petition related to the district court's release of sensitive letters submitted in anticipation of Quattrone's sentence. Because the conviction and sentence have been vacated, that matter is also moot. We are confident that the district court will not release the letters submitted to the court in connection with the sentence.

here, CSFB conducted business through two groups—the Equity Capital Markets Group ("ECMG") and the Global Technology Group (the "Tech Group"). ECMG functioned as a joint group between IBD and the Equity Division and was responsible for bringing IPOs to market. J.A. 100–01 (Tr. 624–25). The Tech Group was responsible for CSFB's investment-banking activity related to technology ("Tech") companies, including underwriting services. J.A. 102 (Tr. 629–30). The Tech Group provided services to two types of customers—Tech company issuer-clients undertaking offerings of equity-based securities and individual customers who traded securities as clients of the Tech Group's Personal Client Services subgroup ("Tech PCS"). J.A. 480 (Tr. 2115). Tech PCS clients were often high-level executives and officers of Tech companies.

In 2000, CSFB employed Quattrone as head of the Tech Group. J.A. 101 (Tr. 626). In that capacity, Quattrone managed 400 technology investment bankers from the firm's Palo Alto, California office. Quattrone and members of the Tech Group provided services in connection with the underwriting of Tech IPOs, "including soliciting underwriting business from issuing companies; negotiating the terms of CSFB's underwriting relationship with issuing companies . . .; conducting 'due diligence' of the issuing companies; assisting in marketing the IPO . . .; assisting in determining the [offering] price . . .; and assisting in allocating shares of the IPOs among investors." Appellee Br. 5–6.

### B. The Government's Evidence at Trial

*1. Evidence Concerning the Investigations and Quattrone's Awareness of the SEC and Grand Jury Investigations*

In May 2000, the National Association of Securities Dealers ("NASD") launched an investigation into "CSFB's underwriting of the IPO of VA Linux Systems, Inc. ('VA Linux'), widely regarded as the 'hottest IPO in the history of Wall Street.' " Appellee Br. 8 (quoting J.A. 124–25 (Tr. 714–20)). On May 17, 2000, the Enforcement Department of NASD Regulation ("NASDR") issued a document request to CSFB that indicated the NASDR was conducting a review of certain offerings and requesting all documents relating to the allocation of the VA Linux IPO. J.A. 638 (Gov.Ex. 11). Quattrone never saw the document request.

Documentary evidence—in the form of emails received or sent by Quattrone—established that in early June 2000 Quattrone learned of the NASD's investigation into the VA Linux IPO and that the investigation had called for all documents relating to CSFB's allocation process. J.A. 642 (Gov.Ex. 102). On June 2, 2000, CSFB's Legal Compliance Department ("LCD") advised Quattrone and others via email that LCD had received an inquiry from the NASDR in connection with that IPO and that all documents relating to the IPO should be preserved. J.A. 641 (Gov.Ex. 100). Twenty-three minutes after receiving the email, Quattrone responded, inquiring as to the nature of the investigation. J.A. 640 (Gov.Ex. 101). Three days later, a CSFB attorney replied that the investigation seemed directed "toward the allocation process" and that "[t]he request is extremely broad and requires production of all documents[,] including e-mails and voice-mails relating to the allocation process." J.A. 642 (Gov.Ex. 102).

In July 2000, Quattrone learned that the SEC's Office of Compliance Inspections and Examinations was investigating CSFB's underwriting process. J.A. 131 (Tr. 743). On July 10, 2000, Quattrone

received an email from an LCD employee informing him that CSFB had received notice that the "the SEC [would] be conducting an examination of CSFB's Equity Underwriting Process" and had called for CSFB documents "regarding the equity underwriting process, including, but not limited to, the engagement of the client, the pricing of the issue [being sold], and the allocation process." J.A. 645 (Gov.Ex. 201).

On September 20, 2000, Quattrone, along with other senior CSFB executives, was informed by Michael Radest, then the head of LCD, that the SEC had transferred its investigation to the Division of Enforcement: "We have been informed today that the SEC's examination of our IPO allocation process has been referred to the SEC's Division of Enforcement. We also understand that the SEC has contacted certain customers of the Firm in conjunction with this investigation." J.A. 648, 480 (Gov. Ex. 400; Tr. 2114). In response, Quattrone immediately forwarded the email to David Brodsky, then General Counsel for the Americas and a Managing Director at CSFB, J.A. 254 (Tr. 1229), inquiring whether it was "ok to copy [J]ohn [S]chmidt who runs our [T]ech [PCS] group?"[7] Brodsky replied that Quattrone should not, as the communica-

tion would not be privileged and it was likely that Quattrone could be called as a witness before the SEC. Because Quattrone might be called, Brodsky wished to avoid "any inference whatsoever that anyone was trying to influence anyone else's testimony." J.A. 650 (Gov.Ex. 402).

On October 18, 2000, the SEC issued a formal administrative order authorizing SEC staff to issue subpoenas and to take testimony in connection with the investigation into CSFB's allocation practices.[8] Appellee Br. 11. That day, the SEC issued a subpoena duces tecum to CSFB. J.A. 676–80. The subpoena focused on two specific IPOs—VA Linux and Selectica, Inc.—and demanded production of "[a]ll documents . . . relating to CSFB's policies and procedures for the allocation of IPO shares." J.A. 678. Quattrone never saw the SEC's subpoena or earlier document requests.

During October 2000, Quattrone received several emails from LCD personnel seeking documents relevant to the SEC's investigation of CSFB's IPO allocation practices and responded to them by directing his assistant to produce relevant documents or by informing LCD personnel that he was not involved with the transactions in question. *See* J.A. 685–88, 691–94 (Gov. Exs.504–06, 508, 510–12, 514).[9] Often, the

---

7. Although Quattrone forwarded the Radest email to Brodsky, Brodsky had also received the Radest email. Quattrone testified that he contacted Brodsky instead of Radest because he was more familiar with Brodsky than with Radest and that he felt comfortable asking Brodsky a legal question. J.A. 480 (Tr. 2116).

8. The SEC has the power to investigate "whether any person has violated, is violating, or is about to violate any provision" of the Securities Exchange Act of 1934. 15 U.S.C. § 78u(a)(1). To assist its investigatory function, the SEC has the power to issue process, including subpoenas, and to take testimony under oath. *Id.* § 78u(b). The SEC conducts two types of investigations—informal (or preliminary) and formal investiga-

tions. *See* 17 C.F.R. § 202.5(a). It cannot issue process or take testimony during the informal stage of the investigation. *Id.* If, however, the investigation progresses, the SEC may issue a formal administrative order directing investigation, which may provide authority to issue process and compel testimony. *See id.; see also* 5 THOMAS L. HAZEN, THE LAW OF SECURITIES REGULATION §§ 16.28[1]-[4], at 124–30 (5th ed.2005); Mark D. Hunter, *SEC/DOJ Parallel Proceedings: Contemplating the Propriety of Recent Judicial Trends*, 68 Mo. L. REV. 149, 157–61 (2003).

9. The evidence at trial established that Quattrone was, on occasion, involved in the allocation process. That involvement was docu-

emails conveyed to Quattrone information about the scope of the documents sought by the SEC. For example, one informed Quattrone and four other CSFB employees of the need to produce documents that went to the heart of the IPO process, including documents that would be held by bankers working under Quattrone in the Tech Group: "In response to the SEC investigation of IPO allocations, we need to review all documents related to valuation and pricing of Selectica, Inc., including notes, memoranda, e-mails on your pc, etc." J.A. 691 (Gov.Ec.510).

Around the same time, a federal grand jury empaneled in the Southern District of New York joined the investigation into CSFB's IPO allocation practices. Appellee Br. 12. On November 21, 2000, the grand jury issued subpoenas to CSFB and eight CSFB officers. J.A. 695–713 (Gov. Ex. 31A–I); Appellee Br. 12. Similar to the SEC document requests and subpoena, the grand jury subpoena duces tecum issued to CSFB sought documents relating to IPOs underwritten by CSFB, including documents relating to Tech IPOs. Appellee Br. 12. That subpoena also mandated production of "[a]ll documents relating to the allocation of shares of" all the IPOs in which CSFB participated from January 1, 1999, through the date of the subpoena. J.A. 696–97. Several critical events followed shortly thereafter.

On Sunday, December 3, 2000, Quattrone learned that the grand jury had joined the IPO investigation, indicating that the investigation had taken an ominous turn. At 2:04 p.m.[10] on that day, Brodsky emailed Quattrone, informing him that there had been "recent developments that are of extreme concern" related to the SEC and NASD inquiry "into our alloca-

tion processes in the IPO market." J.A. 721 (Gov.Ex. 603). Brodsky asked Quattrone to phone either that day or Monday, indicating that he needed to speak with Quattrone "as soon as possible" about those developments. *Id.* At 4:51 p.m., Quattrone asked Brodsky to email the details of his concerns, as Quattrone was busy. J.A. 722 (Gov.Ex. 604). Brodsky responded at 5:40 p.m. and emphasized the urgent nature of the situation, noting the existence of the grand jury investigation and subpoenas demanding information related to CSFB's allocation practices:

> Briefly, and this should absolutely not be passed on to anyone else, we have received Federal Grand Jury subpoenas asking for testimony and documents about the IPO allocation process from the firm and each of the nine people who has so far testified before the NASDR. I have retained Bob Fiske to represent us in this criminal investigation and he and I are meeting as early as tomorrow with the U.S. Attorney in N.Y. to try to prevent them from sending subpoenaes for testimony and documents to the customers who received allocations in, among others, VA Lynux, [sic] as well as subpoenaes to the issuers, because of the inherent possibility of a leak which would be extremely detrimental. Please call me tonight up to 10 pm or tomorrow.

J.A. 723 (Gov.Ex. 605). Within minutes, Quattrone sent two emails again asking Brodsky for further information. At 5:47 p.m., he asked Brodsky if "the regulators [were] accusing us of criminal activity?" J.A. 724 (Gov.Ex. 606). A minute later, Quattrone inquired "[w]ho are the nine people [subpoenaed to testify]?" J.A. 726

mented in emails, although Quattrone may not have made specific allocation decisions.

**10.** The times referenced by the Court are in Pacific Standard Time unless otherwise indicated.

(Gov.Ex. 607).[11] Brodsky quickly indicated that while CSFB had not been formally accused, the grand jury suspected some wrongdoing. At 5:54 p.m., Brodsky informed Quattrone that:

> [T]hey are not formally accusing us or the [subpoenaed] individuals yet, but they are investigating because they think something bad happened. They are completely wrong but merely being investigated and having something leak could be quite harmful, so the idea is to get them to back off [of] their inquiry, we educate them as to the entire IPO process, inclusding [sic] the allovcation [sic] issues and criteria, and urge them to back off.

J.A. 728 (Gov.Ex. 608). Two minutes later Brodsky wrote:

> But please do not under any circumstances discuss these facts with anyone—however innocently—because everything we say now is going to come under a microscope. I know these people and how they work and I am controlling the flow of information on an extremely tight need to know basis with all sorst [sic] of privileges attached. This is serious and unless I can slow it down and curtail what they do, it will spread to others in the firm. That's why I do need to speak with you personally.

J.A. 730 (Gov.Ex. 609). Five minutes later, at 6:01 p.m., Quattrone responded "Got it." J.A. 732 (Gov.Ex. 610).

### 2. The Endorsement Email

At 3:20 p.m. on December 4th, Richard Char, a banker in the Tech Group, circulated a draft email (the "Char Email") to Quattrone, his two principal deputies in the Tech Group, and a Tech Group lawyer. J.A. 792; Appellee Br. 14.

> With the recent tumble in stock prices, and many deals now trading below issue price, I understand the securities litigation bar is mounting an all out assault on broken tech IPOs.
>
> In the spirit of the end of the year (and the slow down in corporate finance work) you may want to send around a memo to all corporate finance bankers (and their assistants) reminding them of the CSFB document retention policy and suggesting that before they leave for the holidays, they should catch up on file cleanup.
>
> Today, it's administrative housekeeping. In January, it could be improper destruction of evidence.

J.A. 792. Upon receiving the Char Email, Quattrone immediately responded, scolding Char that he "shouldn't make jokes like that on email!" J.A. 793. Another CSFB employee who was unaware of the pending grand jury investigation told Char to send the email. J.A. 794; Appellee Br. 15. At 5:13 p.m. on December 4, 2000, Char sent the email to all Tech Group bankers:

> Subject: Time to clean up those files
>
> . . . .
>
> With the recent tumble in stock prices, and many deals now trading below issue price, the securities litigation bar is expected to [sic] an all out assault on broken tech IPOs.
>
> In the spirit of the end of the year (and the slow down in corporate finance work), we want to remind[ ] you of the CSFB document retention policy.... The relevant text is:
>
> "For any securities offering, the Designated Member should create a transaction file consisting of (i) all filings made

---

11. The grand jury actually issued eight subpoenas to individuals and one to CSFB as a corporate entity.

with the SEC in connection with an SEC registered offering or, in an unregistered offering, the final offering memorandum used in a Rule 144A offering or other form of private placement, (ii) the original executed underwriting or placement agent agreements, (iii) the original executed comfort letters from accountants, (iv) the original executed opinions of counsel and (v) a completed document checklist .... In order to avoid confusion and ensure greater compliance with these policies, no file categories other than those set forth in Exhibit B may be created in connection with any CSFB managed securities offering without the approval of your time leader and a lawyer in the IBD Legal and Compliance Department or the CDG Manager."

So what does this mean? Generally speaking, if it is not (i)—(v), it should not be left in the file following completion of the transaction. That means no notes, no drafts, no valuation analysis, no copies of the roadshow, no markups, no selling memos, ... no internal memos.

Note that if a lawsuit is instituted, our normal document retention policy is suspended and any cleaning of files is prohibited under the CSFB guidelines (since it constitutes the destruction of evidence). We strongly suggest that before you leave for the holidays, you should catch up on file cleanup.

J.A. 795.

After receiving the Char Email, Quattrone began drafting a reply directed to the Tech Group (the "Endorsement Email"). On December 4, 2000, Quattrone

managed only to write "having been a key witness in a securities litigation case in south texas (miniscribe)" before the draft Endorsement Email was saved to a computer folder housing email drafts.[12] J.A. 162–63 (Tr. 864–66); Gov. Ex. 615B. The next day at 1:47 p.m. Eastern Standard Time, Quattrone received more bad news about the grand jury investigation from Brodsky. At that time, Brodsky telephoned Quattrone and informed him that he should retain a lawyer as it was likely that he would be called before the grand jury or the SEC as a witness.[13] J.A. 272–73 (Tr. 1293–96). In addition, Brodsky informed Quattrone that someone had leaked the investigations of CSFB's allocation practices to the Wall Street Journal. J.A. 273 (Tr. 1297).

At 6:28 p.m., after learning of the Wall Street Journal leak and being told to retain counsel, Quattrone transmitted his completed Endorsement Email:

> having been a key witness in a securities litigation case in south texas (miniscribe) i strongly advise you to follow these procedures.

J.A. 796. Below the text of the Endorsement Email was the day-old Char Email. See J.A. 795. As a result of the Endorsement Email, at least some Tech Group bankers began or continued "cleaning" their files. J.A. 241 (Tr. 1175–77).

LCD took steps to countermand the Char and Endorsement Emails on December 6, 2000. LCD sent out an email informing Tech Group bankers not to destroy documents: "Yesterday Frank [Quattrone] and Richard [Char] reminded

---

**12.** Apparently, the email software used by Quattrone saved drafts either when a user manually saved works in progress to the folder or when a user began drafting an email and simply stopped for a given period of time. J.A. 162 (Tr. 865).

**13.** At trial, Brodsky could not recall whether he described the investigations as specifically involving the SEC and the grand jury, although he did so "in substance." J.A. 273 (Tr. 1296).

everyone to edit their files to comply with our Document Retention Policy. However, due to a routine regulatory inquiry, we must stop the editing process for public offerings until further notice." J.A. 771 (Gov.Ex. 645). On December 7, 2000, Brodsky contacted Quattrone by phone and told him that Quattrone's Endorsement Email was "a pretty serious problem for the bank and for him." J.A. 276 (Tr. 1309).

### 3. Evidence of Statements by Quattrone Subsequent to the Endorsement Email

Two years later in January 2003, the Wall Street Journal and New York Post obtained copies of the emails and planned to publish stories about them.[14] J.A. 307 (Tr. 1435). Following additional press inquiries concerning the emails, Gary Lynch, Vice Chairman at CSFB and the company's top lawyer, called Quattrone's counsel on January 29, 2003, to speak with Quattrone. J.A. 307–08 (Tr. 1434–38). Lynch called specifically to confirm that Quattrone had not been aware of the regulatory investigations when he sent the Endorsement Email. J.A. 308 (Tr. 1438–39). Lynch testified that Quattrone responded "he was not aware of the regulatory investigations at the time that he issued his email and he also said that [LCD] could check with Adrian Dollard [a CSFB lawyer with the Tech Group] ... who could also confirm that." Id. Lynch did not mention the 2000 grand jury investigation to Quat-

trone because Lynch was not aware at that time that there had been a grand jury investigation in 2000—although he knew that a grand jury investigation had taken place related to IPO allocations.[15] J.A. 310 (Tr. 1447).

When the Wall Street Journal article appeared on January 30, 2003, it made no reference to Quattrone's contention that he had not known about the investigations when he sent the Endorsement Email. J.A. 310 (Tr. 1445). Quattrone sent an email to Lynch on the morning of the 30th, noting that " 'neither article mentions that we had not been informed of the investigation prior to when the e-mails were sent. Could you please confirm they were backgrounded on that fact and chose to ignore it?' " Id. The trial evidence clearly established that Quattrone was aware of the SEC and grand jury investigations in late 2000. Thus Quattrone's statement to Lynch two years later was either a lie or the product of a clouded memory.[16]

The government took the view that "Quattrone sought to obstruct [g]rand [j]ury and SEC investigations of CSFB's practices in allocating shares of certain initial public offering ... securities by directing hundreds of his subordinates to destroy IPO-related documents." Appellee Br. 2–3. According to the government, "Quattrone's document destruction directive came after he had repeatedly been told about the nature and existence of the investigations, after he had repeatedly

---

**14.** Indeed, the Wall Street Journal published a story discussing the Endorsement Email. See Randall Smith, Susan Pulliam & Charles Gasparino, CSFB E-mail Urged Deletion of IPO Documents, WALL ST. J., Jan. 30, 2003, at C5.

**15.** Lynch did not work at CSFB during the events surrounding the Endorsement Email. J.A. 308 (Tr. 1436).

**16.** At retrial, the government also introduced portions of Quattrone's testimony from his initial trial regarding his role in the IPO allocation process to establish that Quattrone's prior trial testimony was inconsistent because he minimized his role in IPO allocation decisions on direct while admitting involvement in allocation decisions on cross and to show that Quattrone played "an important role in IPO allocations." Appellee Br. 20.

been asked to collect and produce IPO-related documents for use in the investigations, just one day after he had learned that the regulatory investigation had escalated into a federal [g]rand [j]ury investigation, and just hours after one of CSFB's top legal officers had advised Quattrone to retain independent counsel to represent him in the [g]rand [j]ury investigation." Appellee Br. 3.

### C. The Defense Case

Quattrone's defense was built on his lack of knowledge that subpoenas demanded Tech Group documents, his lack of intent or motive to obstruct justice, and the implausibility of the government's theory. Quattrone contended that he never knew about the SEC subpoena and knew almost nothing about the grand jury subpoena that called for documents involving hundreds of IPO transactions. Appellant Br. 21. Quattrone testified on his own behalf and called seven additional witnesses, including three character witnesses and one summary witness.[17]

Richard Char testified that it was his idea to send the clean-up email and that he did not discuss the email with Quattrone prior to December 4. Appellee Br. 20. On cross-examination, Char agreed that the thrust of his email was that bankers should discard all documents that they were not supposed to retain. J.A. 363 (Tr. 1650). Char confirmed that the Tech Group had not been asked to preserve documents concerning all of CSFB's 1999–2000 IPO transactions. Appellant Br. 21.

Adrian Dollard, a CSFB lawyer assigned to the Tech Group, offered testimony that provided an explanation why Quattrone could have been mistaken—instead of lying—when he indicated to Lynch in

January 2003 he was unaware of the IPO allocation investigations at the time of the Endorsement Email. Dollard explained that in preparing Quattrone for a deposition in another matter in late November 2002, he provided Quattrone with emails sent and received by Quattrone around the time of the December 3, 2000, exchange between Quattrone and Brodsky, as Quattrone could not recall the events of December 2000. J.A. 338–40 (Tr. 1556–61). Although Dollard informed Quattrone that the packet of emails given to Quattrone constituted all relevant emails, the December 3rd exchange in which Brodsky told Quattrone about the grand jury investigation was *not* included. *Id.* Quattrone argued that while his memory of the events of December 2000 had been hazy, his memory was falsely refreshed by the information provided by Dollard only a few months before Quattrone's conversation with Lynch, thus providing an innocent explanation for Quattrone's false statement. Appellant Br. 20–21.

Quattrone testified regarding many key aspects of the case. On direct examination, he testified that he sent the Endorsement Email to reinforce Char's email and to encourage bankers in the Tech Group to follow CSFB's document retention policy. J.A. 397 (Tr. 1788). Quattrone also testified that while he was aware of the SEC and grand jury investigations into IPO allocations, he believed that the investigations related only to hedge funds that paid large commissions to get IPO allocations. *Id.* Quattrone took the view that the Char Email had nothing to do with the SEC and grand jury investigations because commission payments by hedge funds were irrelevant to Char's directive. *Id.* Quattrone

---

17. The summary witness provided testimony regarding summaries of emails and phone calls sent and received by Quattrone from December 3, 2000, through December 5, 2000. *See* J.A. 811–44.

also testified that he did not intend to obstruct any SEC or grand jury investigation and did not intend to influence others to destroy documents that had been called for by a grand jury or SEC subpoena. J.A. 397 (Tr. 1788–89). Rather than thinking about the investigations when he sent the Endorsement Email, Quattrone testified that he was concerned about getting home to meet family commitments. J.A. 423 (Tr. 1893). Quattrone further testified that he never knew that the SEC had issued a subpoena and that while he was aware that there was a grand jury subpoena, he never read it or had its contents described to him. J.A. 398 (Tr. 1790). In reference to the January 2003 misstatement to Lynch, Quattrone testified that his recollection had been wrongly refreshed by Dollard. J.A. 433 (Tr.1930–31).

## Discussion

### I. Sufficiency of the Evidence Concerning Quattrone's Mental State

#### A. Standard of Review

■ The standard of review applied to sufficiency challenges places a "heavy burden" upon the defendant attacking the judgment. *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir.1994), *quoted in United States v. Glenn*, 312 F.3d 58, 63 (2d Cir.2002). "We overturn a conviction on that basis only if, after viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in its favor, we determine that 'no rational trier of fact' could have concluded that the Government met its burden of proof." *Glenn*, 312 F.3d at 63 (quoting *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir.1998)). The court must ask "whether … *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence adduced at trial.

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ While courts must be convinced that the government has established every element of the offense beyond a reasonable doubt, *see In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), they must review the evidence in its totality and may not reject a jury verdict simply because it rests even wholly on circumstantial evidence. *See United States v. MacPherson*, 424 F.3d 183, 192 (2d Cir. 2005). Despite the deference owed jury determinations, courts may not credit inferences within the realm of possibility when those inferences are unreasonable. *See id.* Where competing plausible inferences "consistent with innocence as well as with guilt might be drawn from circumstantial evidence," sufficiency analysis is unaffected "because 'it is the task of the jury, not the court, to choose among competing inferences.'" *Id.* at 190 (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir.2004)). Possible innocent motivation for conduct does not prevent a jury from drawing inferences adverse to the defendant's proffered explanation. *See id.*

#### B. Sufficiency of the Evidence Underlying Quattrone's Conviction

On appeal, Quattrone presses that the evidence was insufficient on each count because the government failed to establish that he knew that Tech Group files were covered by the grand jury or SEC subpoenas. Quattrone also contends that the evidence failed to prove that Quattrone sent the Endorsement Email with the "corrupt" intent required by each of the statutes relevant to the indictment. The government counters that the evidence amply demonstrated that Quattrone, as head of the Tech Group and someone often involved in IPO allocation decisions, was aware that the SEC and grand jury inves-

tigations called for documents held by Tech Group bankers. Further, the government argues that the circumstances surrounding the Endorsement Email, coupled with the threat Quattrone perceived from the investigations and his subsequent false statement to Lynch, make reasonable the inference that Quattrone acted with the necessary "corrupt" intent when he sent the Endorsement Email. Because we think a rational trier of fact could credit the inferences that the government urges, the evidence is sufficient to support Quattrone's conviction on each count.[18]

### 1. The Sufficiency of the Section 1503 Charge

#### (a) Legal Elements

■ In order to convict for obstruction of justice under the omnibus clause of section 1503, the government must establish (1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so—that is, "that the defendant corruptly intended to impede the administration of that judicial proceeding." *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir.2003) (citing *United States v. Maloney*, 71 F.3d 645, 656 (7th Cir.1995)); *see also United States v. Aguilar*, 515 U.S. 593, 599, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995).

In *Aguilar*, the Supreme Court charted the "metes and bounds" of the omnibus clause, expressly embossing a nexus limitation on the statute. *See Aguilar*, 515 U.S. at 599–600, 115 S.Ct. 2357. The nexus limitation is best understood as an articulation of the proof of wrongful intent that will satisfy the *mens rea* requirement of "corruptly" obstructing or endeavoring to obstruct. As used in the statute, the word corruptly is "normally associated with wrongful, immoral, depraved, or evil." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 125 S.Ct. 2129, 2136, 161 L.Ed.2d 1008 (2005). In *Aguilar*, the Court noted that to prove the accused was corruptly endeavoring to influence, obstruct or impede a grand jury investigation, the government had to prove a connection between the defendant's intentional acts and the likelihood of potentially affecting the administration of justice:

> The action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority. *United States v. Brown*, 688 F.2d 596, 598 (C.A.9 1982) (citing cases). Some courts have phrased this showing as a "nexus" requirement—that the act must have a relationship in time, causation, or logic with the judicial proceedings. *United States v. Wood*, 6 F.3d 692, 696 (C.A.10 1993); *United States v. Walasek*, 527 F.2d 676, 679, and n. 12 (C.A.3 1975).

**18.** Quattrone was tried and convicted for violations of the omnibus provisions of section 1503 (obstruction of justice) and 1505 (obstruction of agency proceedings). The " 'Omnibus Clause' serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice" and is so termed because, in comparison to earlier portions of either sections 1503 or 1505, it "is far more general in scope." *Aguilar*, 515 U.S. at 598, 115 S.Ct. 2357. The parties treat the statutes the same for analytical purposes, and we see no reason for taking a different tack. The only relevant distinction between the two statutes—at least in the context of this case—lies in the attendant circumstance of the obstruction.

In other words, the endeavor must have the " 'natural and probable effect' " of interfering with the due administration of justice. *Wood, supra,* at 695; ... This is not to say that the defendant's actions need be successful; an "endeavor" suffices.... But as in *Pettibone* [*v. United States,* 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1893)], if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct.

*Aguilar,* 515 U.S. at 599, 115 S.Ct. 2357.

Applying this standard, the Court struck down the obstruction of justice conviction of a United States District Court judge who provided false statements to an investigating agent where the agent had "not been subpoenaed or otherwise directed to appear before the grand jury." *Id.* at 601, 115 S.Ct. 2357. The Court vacated the conviction because the false statements could not "be said to have the 'natural and probable effect' of interfering with the due administration of justice." *Id.* The Court came to this conclusion even though the lied-to agent had represented to Aguilar that, in substance, the grand jury might hear evidence related to Aguilar's attempt to thwart its investigation. *See id.* at 595–97, 600, 115 S.Ct. 2357; *see also Arthur Andersen LLP,* 125 S.Ct. at 2136–37 (discussing *Aguilar* ).

■■■■ The touchstone for the nexus requirement, therefore, is an act taken that would have the natural and probable effect of interfering with a judicial or grand jury proceeding that constitutes the administration of justice; that is, "the act must have a relationship in time, causation, or logic with the judicial proceedings." *Aguilar,* 515 U.S. at 599, 115 S.Ct. 2357. In the context of a grand jury subpoena, this rule limits criminal liability to cases where the defendant has notice that his wrongful conduct will affect the administration of justice, because false information will be provided to a grand jury or otherwise pertinent information known to be called for by a grand jury may be placed beyond its reach. *Cf. id.* A defendant's awareness that a subpoena seeks documents, coupled with his actions taken to place those documents beyond the grand jury's reach clearly would meet the hemming function of the nexus requirement. The defendant need not read the grand jury subpoena or know its precise contents; it is enough if he knows that a subpoena calls for a category of documents, or even one particular document, and then takes steps to place those documents beyond the reach of the grand jury.[19]

(b) The Evidence was Sufficient to Support Conviction for Violation of Section 1503

(i) The Nexus Requirement

■■■■ There was sufficient evidence from which a trier of fact could conclude that the government established the nexus element of Count 1. A rational trier of fact could conclude beyond a reasonable doubt

---

**19.** Quattrone's brief suggests at times that a defendant would have to be aware of the entire contents of the relevant subpoena to have corruptly impeded the grand jury investigation. *E.g.,* Appellant Br. 26. Nonetheless, he concedes that he could be convicted if "he *knew* that the documents [Quattrone encouraged to be destroyed] otherwise would be produced, *i.e.,* that they were covered by subpoena." Appellant Br. 28. In support of the latter proposition, Quattrone points to two cases in a footnote, *United States v. Rasheed,* 663 F.2d 843, 852 (9th Cir.1981), and *United States v. Shoup,* 608 F.2d 950, 962 (3d Cir. 1979). Neither case prevents us from concluding that the nexus requirement is met when one directs or attempts to direct the destruction or concealment of documents known to be generally responsive to a grand jury subpoena.

that Quattrone knew that his conduct would obstruct the grand jury's investigation because there was a logical relationship between his knowing conduct—sending the Endorsement Email while aware of the grand jury subpoena's call for documents relating to the IPO allocation process that were in the possession of Tech Group bankers—and the effect it was likely to have—destruction of documents that otherwise would have been produced. The evidence clearly indicates Quattrone knew of the parallel investigations of CSFB's IPO allocation practices and that the Tech Group was involved in allocation decisions. Combined with the threat that the investigations posed to Quattrone, the jury could infer that Quattrone was aware that his conduct was likely to affect the grand jury investigation.

A series of emails established that Quattrone knew that the SEC and NASD had begun informal investigations into CSFB's allocation practice and that the SEC investigation had escalated by the Fall of 2000. In June 2000, Quattrone learned that the NASD had begun an inquiry into the VA Linux IPO, underwritten by bankers in the Tech Group. J.A. 640–43 (Gov.Exs. 100–03). The investigation focused only on VA Linux; Quattrone produced documents responsive to that inquiry. *See id.* Soon thereafter, on July 10, 2000, Quattrone learned that the SEC would "be conducting an examination of CSFB's Equity and Underwriting [p]rocess beginning Friday July 14, 2000." J.A. 645 (Gov.Ex. 201). The inquiry was expected to last 4–6 weeks. *See Id.* The email from LCD informing Quattrone of the SEC investigation noted that the SEC "ha[s] asked [CSFB] to produce ... documents" related to the equity underwriting process, "including, but not limited to, the engagement of the [IPO issuing] client, the pricing of the issue, and the allocation process." *Id.*

Two months later, on September 20, 2000, Quattrone, along with other senior CSFB executives, learned from the head of LCD, Radest, that the SEC's investigation "of [CSFB's] IPO allocation process has been referred to the SEC's Division of Enforcement." J.A. 648 (Gov.Ex. 400). Thus, Quattrone was aware that the investigation into CSFB was escalating and knew that it focused on IPO allocation practices. Quattrone forwarded the email to Brodsky—CSFB's chief lawyer in America and also a recipient of the Radest email—and inquired whether Quattrone could pass the email on to John Schmidt, the head of Tech PCS. J.A. 649 (Gov.Ex. 401). Brodsky replied, instructing Quattrone not to pass on the email as it was likely that Quattrone and Schmidt would be called before the SEC. *Id.*

Additional evidence from the days leading up to the Endorsement Email buttressed the inference that Quattrone was aware that encouraging the destruction of Tech Group documents would affect the grand jury investigation. First, Quattrone learned of the grand jury subpoena—and that it called for documents related to the IPO process—via a series of emails with Brodsky on Sunday, December 3, 2000. Alerting Quattrone to developments of "extreme concern," J.A. 721 (Gov.Ex. 603), Brodsky informed Quattrone that "we have received Federal Grand Jury subpoenas asking for testimony and documents about the IPO allocation process from the firm and each of the nine people who has so far testified before the NASDR. I have retained Bob Fiske to represent us in this criminal investigation ...." J.A. 723 (Gov. Ex. 605). Six minutes later, Quattrone responded, asking whether "the regulators [are] accusing us of criminal activity?" J.A. 724 (Gov.Ex. 606). One minute later, Quattrone further replied, "Who are the nine people?" J.A. 726 (Gov.Ex. 607). Brodsky replied six minutes later, and

again two minutes later, emphasizing the seriousness of the grand jury subpoena. J.A. 728–30 (Gov.Exs.608–09). At this point, it would be reasonable for a rational juror to conclude that Quattrone was aware that the grand jury sought documents that were in the possession of the Tech Group, given Quattrone's participation in the allocation process.[20] *See supra* note 8.

Second, on December 5, 2000,—only hours before the Endorsement Email was sent—Brodsky called Quattrone and discussed (1) the threat of a leak regarding the grand jury investigation to the Wall Street Journal; and (2) the prospect that Quattrone was likely to be called as a witness in the SEC and grand jury investigations. J.A. 273 (Tr. 1296–97). Quattrone then sent the Endorsement Email at 6:28 p.m. to all bankers in the Tech Group. J.A. 796.

The evidence supports the inference that Quattrone was aware that the grand jury subpoena to CSFB called for documents covered by his email—Tech Group documents related to the IPO allocation process. Trial Testimony supported the conclusion that the Tech Group created documents relating to the IPO process, including documents related to allocation of IPO shares to investors. *E.g.*, J.A. 103, 239–40 (Tr. 634–35, 1166–72). The jury could rationally infer that Quattrone, as head of the Tech Group, was aware of the type of documents created by the Group. Having seen Brodsky's December 3 emails and Quattrone's responses, the jury could conclude that Quattrone knew that the grand jury subpoena required documents related to the allocation process. At this critical juncture, Quattrone knew "that his actions [were] likely to affect the judicial proceeding." *Aguilar*, 515 U.S. at 599, 115 S.Ct. 2357. Accordingly, the evidence

was sufficient to establish the nexus element of section 1503.

### (ii) Corrupt Intent

 There was also sufficient evidence from which the jury could conclude beyond a reasonable doubt that when he sent his Endorsement Email, Quattrone acted with corrupt intent, *i.e.* the "wrongful" or "immoral" intent to obstruct the grand jury's administration of justice. *See id.* at 599, 115 S.Ct. 2357. Quattrone contends the evidence failed to establish an improper motive. He asserts that the Endorsement Email was innocent on its face and that the circumstances that the government relied on to establish his intent are merely equivocal facts as consistent with innocence as with guilt. *E.g.*, Reply Br. 16–17. The government responds that the circumstances surrounding the Endorsement Email established that Quattrone sent the email with the wrongful intent to obstruct, that Quattrone's innocent explanation for sending the email was rejected by the jury, and that Quattrone's subsequent false statement to Lynch supports the inference that Quattrone corruptly intended to obstruct when he sent that email. Appellee Br. 42–45.

The events leading to the Endorsement Email coupled with Quattrone's false statement to Lynch provided sufficient evidence to sustain the jury verdict. Quattrone's awareness of the subpoena's reach to Tech Group documents and the rapid escalation of the investigation between the time that Quattrone began drafting and sent the Endorsement Email, coupled with the subsequent false statement to Lynch, created a realm of permissible inferences; among them, it would be reasonable for a jury to conclude that Quattrone acted with the

20. *See* J.A. 685–88, 691–94 (Gov.Exs.504–06, 508, 510–12, 514).

improper intent to obstruct the grand jury investigation.

As we have just noted, on December 3, 2000, Brodsky informed Quattrone, in no uncertain terms, of the potential threat of the grand jury investigation into the IPO allocation process as an extension of the NASD and SEC investigations. *See* J.A. 721–23 (Gov.Exs.603–05). Brodsky noted that there was a danger of a leak of the investigation, "which would be extremely detrimental." J.A. 730 (Gov.Ex. 605). Brodsky wrote "[t]his is serious and unless I can slow it down and curtail what they do, it will spread to others in the firm." Gov. Ex. 609. The jury could have reasonably concluded that Brodsky's December 3 emails alarmed Quattrone. From this evidence, the jury could conclude that Quattrone had a motive to prevent any detriment to the bank in order to protect his status and his income.

Evidence also established Quattrone's opportunity to obstruct and acts aimed at that end. On December 4, 2000, Quattrone received the Char Email, began to respond, but then stopped. J.A. 734 (Gov. Ex. 615B). The next day, before sending his Endorsement Email, Quattrone learned from Brodsky about the potentially damning leak of the investigations and the ominous threat that Quattrone might now be a target. *See* J.A. 273. Quattrone then sent his Endorsement Email that evening, promoting the Char Email while employing an exculpatory reason for endorsing the destruction of subpoenaed documents. J.A. 796. The proximity in time between additional negative information from Brodsky and the Endorsement Email, along with Quattrone's awareness that the subpoena called for documents Quattrone knew to be in possession of the Tech Group bankers, provided legally sufficient evidence from which a jury could conclude that Quattrone acted with corrupt intent to obstruct by seeking the destruction of relevant documents.

In addition, the subsequent false statement to Lynch provided additional circumstantial evidence of Quattrone's guilt. Although the evidence of the misstatement might lead to alternative inferences of either deceit or innocent mistake, the jury was in the unique position to observe Quattrone's testimony and to weigh the corroborating evidence of Quattrone's corrupt intent. The jury could reasonably rely in part on the misstatement to conclude that Quattrone acted with the intent to obstruct.

2. *Sufficiency of the Evidence Relating to the Section 1505 Charge for Obstructing Proceedings Before Agencies of the United States*

(a) Legal Elements

To prove obstruction of an agency proceeding, the government must establish that (1) there "was a proceeding pending before a department or agency of the United States;" (2) "the defendant knew of or [believed] . . . that the proceeding was pending;" and (3) "the defendant corruptly endeavored to influence, obstruct, or impede the due and proper administration of the law under which the proceeding was pending." *United States v. Sprecher*, 783 F.Supp. 133, 163 (S.D.N.Y.1992) (citing SAND, ET AL., 1A MODERN FEDERAL JURY INSTRUCTIONS: CRIMINAL ¶ 46.02 (instruction 46–9)). The latter element requires a wrongful intent or improper motive to interfere with an agency proceeding, including the judicially grafted nexus requirement. *Cf. Aguilar*, 515 U.S. at 599, 115 S.Ct. 2357.

(b) The Evidence was Sufficient to Support Conviction for Violation of Section 1505

The evidence clearly established a connection between Quattrone's

acts of obstruction and the SEC proceeding as well as his corrupt intent.[21] As noted above, the grand jury investigation and the SEC inquiry were for the most part simultaneous. Evidence of one was often interwoven with evidence of the other. Thus, just as the evidence of obstruction of justice was legally sufficient to support a conviction, that evidence was equally sufficient to show that Quattrone acted with the wrongful intent to obstruct the SEC's investigation by calling for the destruction of documents known to have been within the scope of its investigation of IPO allocation practices.

We think it clear that there was sufficient evidence from which the jury could conclude that Tech Group bankers would possess some documents sought by the SEC related to IPO allocations. While the question of the degree to which the Tech Group generally, and Quattrone specifically, became involved in making IPO allocations was disputed, evidence at trial indicated that Quattrone was involved in IPO allocation decisions. *See, e.g.,* J.A. 444 (Tr. 1977).

The jury could fairly conclude that Quattrone was aware that the investigation into the allocation process reached the conduct of the Tech Group. When Quattrone received emails from LCD regarding Tech Group IPOs for which document-retention notices had been issued—Selectica, Inc. and VA Linux—the emails made clear that LCD was contacting Quattrone in connection with the "SEC investigation into IPO allocations" to determine his involvement with allocations, valuation, or pricing of the issues. J.A. 685 (Gov.Ex. 504); *see also* J.A. 686–92 (Gov.Exs.505–11). Furthermore, when Brodsky contacted Quattrone regarding the grand jury investigation, he made it clear that that inquiry was an outgrowth of the SEC and NASD investigations "into our allocation processes in the IPO market." *See* J.A. 721–23 (Gov. Exs.603–05). In addition, after Quattrone learned from the head of LCD that the investigation into IPO allocations by the SEC had been referred to the Division of Enforcement, Quattrone asked Brodsky if he could forward the email to the head of the Tech PCS group. *See* J.A. 649 (Gov. Ex. 401). Given this evidence, the jury was free to reject to Quattrone's explanation that he thought the investigation focused on a separate business area of the bank.

### 3. Sufficiency of the Section 1512(b)(2) Conviction for Witness Tampering

In order to prove a violation of 18 U.S.C. § 1512(b)(2)(A-B), charged in Count 3, the government must establish that the defendant "knowingly ... corruptly persuade[d]" or "attempt[ed]" to persuade another with the intent to cause that person to "withhold records or testimony" from an official proceeding or to

---

**21.** Quattrone's Brief could be read as raising a distinction between the informal and formal stages of the SEC investigation and whether criminal liability for obstructing an agency "proceeding" can only arise in the context of the latter. In our view, that argument comes up short. Only two pages and a footnote of the 103–page Brief encompass all of the discussion that might be read to raise that concern. *See* Appellant Br. 26–28 & n. 7. When asked at oral argument, Quattrone's counsel agreed that generally an SEC investigation would satisfy the "proceeding requirement."

The indictment, the government's theory of the case, and the court's charge to the jury all took the view that the "proceeding" encompassed both stages of the SEC inquiry. We see no meaningful objection in Quattrone's brief sufficient to crystalize that concern. Accordingly, we do not reach the issue. *Cf. Arthur Andersen,* 125 S.Ct. at 2136 n. 10 (noting that petitioner's argument "that informal inquires are not covered by" section 1512(b) was not preserved for failure to raise before the Court of Appeals).

"alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding." Contrary to earlier circuit precedent, *see, e.g., United States v. Gabriel,* 125 F.3d 89, 102–05 (2d Cir.1997), the Supreme Court's recent decision in *Arthur Andersen* makes clear that *Aguilar* 's nexus requirement applies to some degree to section 1512(b), 125 S.Ct. at 2136–2137.[22] Accordingly, we assume for the purposes of this case only that the evidence that was sufficient to establish the nexus element for the section 1503 charge applies with equal force to establishing that element of the witness tampering charge alleged in Count 3. *See supra* note 18. We do note, however, that section 1512(b) requires proof of a mental state that is "knowingly ... corrupt[ ]" with respect to the action taken. *See Arthur Andersen,* 125 S.Ct. at 2135–36. The Supreme Court has made clear that the conduct to be punished, then, must not only be made with wrongful intent but also with a "conscious[ness]" that the conduct in question is wrongful. *See id.* at 2136.

The practical effect the conscious-wrongdoing standard of section 1512(b) has upon the construction of the nexus requirement as a result of *Arthur Andersen* is not before us. Quattrone does not argue that the distinction makes a difference. Instead he relies on the same set of arguments raised with respect to the section 1503 and 1505 claims—that he did not act with corrupt intent. Appellant Br. 34–35. Accordingly, we rest our analysis of Quattrone's corrupt intent on that set forth in the discussion of the evidence underlying the section 1503 and 1505 convictions. The evidence with regard to Count 3 was clearly sufficient.

## II. Quattrone's Challenges to the Jury Instructions

### A. Arguments Relevant to Quattrone's Challenges

Quattrone raises a number of challenges related to the jury instructions. He presses that the charges given for Counts 1 and 2 were deficient because they misled the jury into concluding that the nexus requirement was satisfied even if Quattrone was unaware that his conduct would affect the relevant proceedings. *E.g.,* Reply Br. 22. He argues forcefully that the charge on Count 3 was insufficient in light of *Arthur Andersen* because the district court stated that no nexus element applied to that charge. Reply Br. 22–27. Quattrone also contends that the court's conscious avoidance charge was in error as there was insufficient evidence to support the conclusion that Quattrone deliberately

---

**22.** The question of whether the nexus requirement applies in the same way to section 1512(b) as it does to sections 1503 and 1505 is not relevant to resolution of this appeal. *See* 18 U.S.C. § 1512(f)(1); *Arthur Andersen,* 125 S.Ct. at 2136–37 ("In resisting any type of nexus element, the Government relies heavily on § 1512(e)(1) [now codified at section 1512(f)(1) ], which states that an official proceeding 'need not be pending or about to be instituted at the time of the offense' [for the purposes of a section 1512 conviction]. It is, however, one thing to say that a proceeding 'need not be pending or about to be instituted at the time of the offense,' and quite another

to say a proceeding need not even be foreseen."); *see id.* at 2136 n. 9 ("The parties have pointed us to two other obstruction provisions, 18 U.S.C. §§ 1503 and 1505, which contain the word 'corruptly.' But these provisions lack the modifier 'knowingly,' making any analogy inexact."). We have held the nexus evidence on Counts 1 and 2 to be sufficient, *supra.* Count 3 relies on the same conduct, and Quattrone does not argue that the nexus element applies differently to the section 1512(b)(2)(A-B) charge. Thus the nexus element of the section 1512(b)(2)(A) charge has been established by sufficient evidence.

remained ignorant of what documents the investigations sought. Reply Br. 27–28.[23]

The government counters that the jury charge as a whole regarding the nexus element of Counts 1 and 2 effectively conveyed to the jury that they could not convict Quattrone unless they found that he knew his actions "would obstruct justice by causing documents responsive to the subpoenas to be destroyed" and that the district court's instruction complied with circuit precedent. Appellee Br. 65, 69 (citing *United States v. Schwarz*, 283 F.3d 76, 107 (2d Cir.2002); *United States v. Solow*, 138 F.Supp. 812, 816 (S.D.N.Y.1956)). Second, the government contends that the district court's failure to give a nexus charge for the witness tampering count was harmless beyond a reasonable doubt. Gov. Supp. Br. 8–9. The government argues that there was sufficient evidence in the record to conclude that Quattrone deliberately avoided learning what documents were covered by the grand jury and SEC and that any error with regard to the conscious avoidance charge was harmless.

## B. The Jury Instructions on Counts 1—3

### 1. Standard of Review

■■■■■ "We review a claim of error in jury instructions *de novo,* reversing only where, viewing the charge as a whole, there was a prejudicial error." *United States v. Aina–Marshall*, 336 F.3d 167, 170 (2d Cir.2003) (citing *United States v. Tropeano*, 252 F.3d 653, 657–58 (2d Cir.2001)). In conducting this review, we examine the charges as a whole " 'to see if the entire charge delivered a correct interpretation of the law.' " *United States v. Bala*, 236 F.3d 87, 94–95 (2d Cir.2000) (citation omitted); *see also United States v. Carr*, 424 F.3d 213, 218 (2d Cir.2005). "An erroneous instruction, unless harmless, requires a new trial." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir.1994). An error is harmless only "if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *Carr*, 424 F.3d at 218 (quoting *Neder v. United States*, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).

■■■■■ "While it may not always be erroneous to fail to give an instruction, a charge which is given must be correct. *De novo* review leads us to [find] error if we conclude that a charge either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard." *United States v. Doyle*, 130 F.3d 523, 535 (2d Cir.1997) (citation omitted). Even so, a defendant may challenge the failure of the district court to provide a charge sought. Where a defendant claims that a district court erred for failing to give his requested instruction, we overturn the conviction only if " 'that instruction is legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge.' " *Id.* at 540 (citation omitted).

### 2. The Nexus Charges Provided for the Obstruction Counts, Counts 1 & 2 [24]

Quattrone claims that both charges incorrectly explained the nexus requirement

---

**23.** Quattrone also attacks the trial court's response to a jury note. Because we are vacating the conviction on other grounds, we need not reach this issue.

**24.** In relevant part, the district court charged the jury on the elements of sections 1503 and 1505:

*Count 1:*

The word "corruptly" as used in the statute means simply having the improper motive or purpose of obstructing justice.

in that each allowed the jury to convict without finding that Quattrone knew that the relevant subpoena or document request called for documents he sought to destroy. Quattrone also argues forcefully that the second portion of that section of the charge, presented in the alternative, is error. He argues that the instruction allowed the jury to find a nexus as a matter of law merely if it found that Quattrone *"had reason to believe* [the documents] were within the scope of the grand jury's investigation."

The paragraphs of the charge preceding the language in question accurately describe the "nexus" requirement. *See Aguilar,* 515 U.S. at 598–600, 115 S.Ct. 2357. However, the charge then incorrectly instructs the jury how to determine if the nexus requirement has been met. The first portion of the "application" section told the jury in effect that if it found that Quattrone merely called for the destruction of documents that were within the scope of those sought by the subpoenas, that finding alone satisfied the nexus element. Clearly, that instruction is not a correct formulation of the law. Under the charge, as given, any defendant who urges the destruction of documents might run afoul of section 1503 (or 1505) without any proof that the defendant knew the documents were subject to a subpoena (or document request). More is required; a de-

. . . .
. . . [T]he elements of the first count of the indictment are:

[First] [t]hat on or about the dates charged in the indictment, the grand jury duly impaneled in this district was conducting an inquiry into alleged violations of the laws of the United States . . . . Second, that the defendant knew of the pending grand jury proceeding or investigation. And third, that the defendant did corruptly influence, obstruct or impede or corruptly endeavor to influence, obstruct or impede the grand jury proceeding or investigation.

. . . .

To establish that the defendant acted with corrupt intent, the government must also prove something called the existence of a nexus between the defendant's conduct, should you find it, and the pending grand jury proceeding. That is to say, the government must prove some relationship in time, causation or logic, between the defendant's actions and the grand jury proceeding so that his action or actions may be said to have the natural and probable effect of interfering with that proceeding. That is nexus.

*I charge that if you find that either, A, the defendant directed the destruction of documents that were called for by a grand jury subpoena, or that[, B,] defendant directed the destruction of documents that he had reason to believe were within the scope of the grand jury's investigation, then this nexus requirement will be satisfied.*

. . . .
*Count 2:*
. . . .

So, as to Count 2, the elements of the offense are that [,first,] on or about the dates charged in the indictment a proceeding was pending before an agency of the United States, here the SEC. Second, that the defendant knew that such proceeding was pending before the said agency of the United States and, 3, that the defendant did corruptly influence, obstruct or impede or corruptly endeavor to influence, obstruct or impede the due and proper administration of the law under which the SEC proceeding was being conducted.

. . . .

I have already charged you on what corrupting means. It means improper motive or purpose of obstructing justice. In connection with this element, the government here too must prove . . . some relationship in time, causation or language [sic] between the defendant's actions and the SEC proceeding so that his action or actions may be said to have the natural and probable effect of interfering with that proceeding.

*So I instruct you that if you find that either, A, the defendant directed the destruction of documents that were called for by the SEC's request or subpoena, or, B, that the defendant directed the destruction of documents that he had reason to believe were within the scope of the SEC's investigation, then this requirement would be satisfied.*

J.A. 562–64 (emphasis added).

fendant must know that his corrupt actions "are likely to affect the . . . proceeding." *Id.* at 599, 115 S.Ct. 2357.[25]

The government relies principally on the argument that given the proof at trial, it would have been impossible for the jury to conclude that Quattrone acted corruptly without also finding that he was aware that the documents affected by his Endorsement Email were covered by subpoena or document requests. Appellee Br. 64–65. The government's argument proceeds from the premise that the general "nexus" instructions were appropriate and that the district court correctly charged the jury with respect to corrupt intent. The government further contends that the general sections of each charge correctly explained the requirement that Quattrone had to know of the relevant proceedings. The government asserts that the jury could not have found Quattrone acted corruptly unless it concluded that Quattrone "believed that his actions would obstruct justice by causing documents responsive to the subpoenas to be destroyed." Appellee Br. 65.

The government presents a forceful and thoughtful argument. However, that argument overlooks a glaring deficiency in the court's charge. When the court finally explained to the jury how to apply the law to the facts, it eviscerated the nexus requirement. It removed the defendant's specific knowledge of the investigatory proceedings and the subpoenas/document requests from the obstruction equation. It left a bare-bones strict liability crime.

Given the court's instruction for the nexus determination, all that need be proven was that an investigation had called for certain documents and that the defendant had ordered the destruction of those documents. Although wrongful intent, corrupt intent, and the nexus requirement were correctly defined, the charge, as a whole, relieved the jury of having to make those findings in assessing criminal liability.

In order to uphold a conviction premised upon erroneous instructions, we must find it "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder*, 527 U.S. at 18, 119 S.Ct. 1827. *Neder* instructs that reviewing courts

> will often [have to] . . . conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.

*Id.*

Quattrone's theory of the case relied on several innocent explanations for his conduct and each has some basis in the record. Among these, Quattrone testified that he had no wrongful intent and that he was not aware that the investigations were focusing on IPO-allocation issues germane

---

**25.** In this regard, we reject Quattrone's proposed instruction that the jury had to find he had knowledge of the scope and subject matter of the grand jury investigation, such that he knew what documents or categories of documents had been subpoenaed by the grand jury and that he corruptly endeavored to obstruct by causing the destruction of documents he knew to be sought in the investigation. Reply Br. 26 n. 15. Under our analysis, it would be sufficient to show that Quattrone knew that his actions were likely to affect the proceeding—*i.e.* that the subpoenas and requests called for the types of documents he generally knew were in the possession of Tech Group bankers who received the Endorsement Email.

to Tech Group activity. J.A. 397–98 (Tr. 1787–90). While the government did offer proof that Quattrone knew that the grand jury and the SEC sought Tech IPO-allocation related documents, we cannot say that the proof convinces us beyond a reasonable doubt that the error was harmless. *See Neder*, 527 U.S. at 17, 119 S.Ct. 1827. That conclusion finds strong support in the deficiency of the court's charge. Under the charge, the jury was allowed to convict Quattrone of obstruction regardless of whether he intended such. Quattrone's defense of lack of knowledge of the specific focus of the investigation of Tech Group

IPO activities was eliminated from the jury's consideration. Accordingly, the judgment of conviction with regard to Counts 1 and 2 must be vacated and the case remanded for retrial.[26]

### 3. The Absence of a Nexus Charge for Count 3 [27]

■ In his Reply Brief, filed after the Supreme Court's decision in *Arthur Andersen*, Quattrone correctly contends that the section 1512(b) instruction was erroneous because the district court understandably[28] told the jury that it need not find any nexus between Quattrone's actions and

---

**26.** Because we find the nexus instructions deficient, we need not reach Quattrone's contention that the second part of the district court's nexus charge, that "the defendant directed the destruction of documents that he had reason to believe were within the scope of the SEC's investigation," J.A. 564, was insufficient to establish the nexus element. *Cf. United States v. Schultz*, 333 F.3d 393, 407 (2d Cir.2003) ("Our failure to address a question that is not necessary to the outcome of a case is simply a wise exercise of our discretion.").

**27.** The charge on Count 3 ran as follows:

So, the elements of the offense of witness tampering are:

First, on or about the dates charged in the indictment the defendant engaged in or attempted to engage in either, A, corrupt persuasion of another person or persons; or, B, misleading conduct toward another person or persons.

. . . .

Second, that the defendant acted knowingly and with the intent to cause or induce such other person or persons either, A, to withhold a record or document from an official proceeding or, B, to destroy or conceal a record or document with the intent to impair those documents' availability for use in an official proceeding.

. . . .

Now, I want to point out two differences between the elements required for you to find guilt on Counts 1 and 2, which are the obstruction of justice counts, and the third one, which charges witness tampering.

First, in connection with the witness tampering charge unlike the obstruction of justice and the obstruction of an agency proceeding charge you do not have to find, and there is no requirement that you find, that the defendant knew that a proceeding was in fact pending or was even about to be initiated at the time of the corrupt persuasion or misleading conduct. That is not an element of the third offense.

*Second, in connection with the witness tampering charge, unlike the obstruction of justice or obstruction of agency proceeding charges, because there is no requirement you find a threat of proceeding impending* [sic] *there is no requirement there be a nexus between the defendant's conduct and the federal proceeding such that the defendant's conduct would have had a natural and probable effect of interfering with the federal proceeding.*

J.A. 564–66 (emphasis added).

**28.** The district court's error in this regard was based upon our precedent, which held that section 1512(b) prosecutions do not require any showing of a nexus between the defendant's actions and the proceeding affected. *See Gabriel*, 125 F.3d at 103–05 ("Accordingly, there is no reason to narrow section 1512(b) by incorporating a 'likely to affect' requirement as the *Aguilar* court did to section 1503."), *overruled in part by Arthur Andersen*, 125 S.Ct. at 2136–37 ("The instructions also were infirm for another reason. They led the jury to believe that it did not have to find *any* nexus between the 'persua[ion]' to destroy documents and any particular proceeding.") (footnote omitted).

the pending investigations. Reply Br. 23. In its Supplemental Brief filed the day before oral argument, the government argues that the section 1512(b) instruction error was harmless beyond a reasonable doubt because the instruction referred specifically to the SEC and grand jury investigations and because the court provided a nexus charge for Counts 1 and 2. Gov. Supp. Br. 8–9. We disagree.

The government's "proceedings" argument falls short of establishing harmless error. The thrust of that argument is that because the district court effectively charged that the jury had to find that Quattrone acted with the "knowingly ... corrupt[ ]" intent to cause the withholding of documents or testimony from "the grand jury and SEC investigations" or to cause the destruction of documents "with intent to impair the object's ... availability" for use in the "grand jury and SEC investigations," there was no reasonable probability Quattrone was wrongly convicted. *Id.* According to the government, the nexus was self evident under the facts of this case. *Id.*

■■■ The burden of establishing harmlessness is on the government. *See, e.g., Gutierrez v. McGinnis*, 389 F.3d 300, 303 (2d Cir.2004) (propounding upon harmless error rules in context of habeas petition).[29] Here, there was more than a failure to charge an essential element of the crime charged. The court informed the jury that a prerequisite to criminal liability—some nexus between the effort to tamper with or withhold documents pertaining to the relevant proceeding and awareness that such conduct was likely to affect the proceeding—was inapplicable. Given this error, the disputed evidence of Quattrone's awareness as to whether the investigations

called for documents to be culled as a result of his Endorsement Email, and the inadequacy of the nexus charges on Counts 1 & 2, we cannot confidently say that if a rational jury was properly instructed, it is clear to us beyond a reasonable doubt that they would have convicted Quattrone on Count 3. Accordingly, the conviction on Count 3 must be vacated, and the case remanded to the district court for retrial.

## C. The Conscious Avoidance Charge

■■■ A "conscious avoidance instruction may be given only (i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction, *United States v. Civelli*, 883 F.2d 191, 194 (2d Cir.1989), and (ii) the appropriate factual predicate for the charge exists, *i.e.*, the evidence is such that a rational juror may reach the conclusion 'beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'" *Aina–Marshall*, 336 F.3d at 170 (quoting *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir.1993)). "But an erroneously given conscious avoidance instruction constitutes harmless error if the jury was charged on actual knowledge and there was 'overwhelming evidence' to support a finding that the defendant instead possessed *actual* knowledge of the fact at issue." *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir.2000) (quoting *United States v. Adeniji*, 31 F.3d 58, 64 (2d Cir.1994)).

The unusual posture of this case presents us with a curious situation. Given the erroneous nexus charge, the conscious avoidance charge was improper. As discussed above, the nexus charge on Counts

**29.** The Court in *Arthur Andersen* did not expressly undertake a harmless error review of the jury instruction errors. The Court concluded that the jury instructions were "flawed in important respects" and reversed. 125 S.Ct. at 2137.

1 and 2 allowed the jury to convict if Quattrone called for the destruction of documents covered by subpoena (or document request), without requiring proof that Quattrone knew of the subpoena or document request. Quattrone never disputed his knowledge that investigations were taking place. He contended that he thought the investigations related to other areas of CSFB. Appellant Br. 12, 20–21. Thus, as charged, there was no information (the existence of a subpoena or document request) that Quattrone needed to consciously avoid.

Reaching the merits on this question is, of course, entirely academic and utterly inappropriate. This case is now headed back to district court for yet another trial. If and when the trial occurs, one would expect that the government and Quattrone will present much of the same proof each offered in the first two trials. What will be different will be the court's charge on the nexus requirements. A jury finding that Quattrone knew of the investigations and the general scope of the subpoena/document requests will be essential, as will a finding that Quattrone intended that his Tech Group bankers would destroy documents covered by the subpoenas if they followed the recommendations of the Endorsement Email. In that light, Quattrone's protestations that he knew of the investigation generally, but was unaware that they focused on activities in his group, might then support a request for a conscious avoidance charge.

### III. Quattrone's Challenges to the District Court's Limits on His Testimony

Quattrone also challenges several rulings by the district court. Because many of the issues raised are likely to be revisit-

ed on retrial, we think it prudent to address them now rather than to sit silent and await another appeal. Quattrone challenges limits placed on his testimony during direct and cross-examination by the district court, arguing that its repeated interference with his testimony crossed the line beyond legitimate trial management and deprived him of a fair trial by unduly interfering with the defense's case and denying him the right to testify on his own behalf. Appellant Br. 53–60. He also argues that the district court erred in sustaining objections to questions posed on direct when those questions were not objectionable.[30] Appellant Br. 53–55. He also forcefully presses that the district court's sua sponte direction that he respond to certain questions with either a "yes" or "no" answer was prejudicial error when coupled with the government's contention on summation that he was evasive in answering those questions. See J.A. 451–53 (Tr.2001–09).

The government responds that the district court's limitations on Quattrone's direct testimony were permissible, because the testimony excluded was objectionable as leading or argumentative. In response to Quattrone's argument related to the restriction on his cross-examination testimony, the government argues that the sua sponte limitation was entirely appropriate because the district court judge had the benefit of observing Quattrone's evasiveness at the first trial. Moreover, when Quattrone expressed an inability to answer a question with a yes or no, the prosecutor rephrased the question posed or offered Quattrone the opportunity to explain. Appellee Br. 88. The government contends that there was nothing unfair or inappropriate about referring to Quattrone's alleged evasiveness in arguing to the jury

---

30. Quattrone also asserts that the district court erred by sometimes raising objections

when none were posed by the government. E.g., Appellant Br. 56–58.

that it could draw only one conclusion from that evasiveness—that Quattrone was not credible. Appellee Br. 89.

Defendants have the right to a fair trial, which necessarily includes the right to testify on their own behalf. *See generally Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). In this Circuit, a defendant's right to a fair trial is infringed when a judge's questions and comments convey to the jury that the judge disbelieves the defendant's testimony. *See United States v. Filani,* 74 F.3d 378, 385 (2d Cir.1996). Trial judges, however, are given discretion to manage trials so that evidence is effectively presented, *see* FED. R. EVID. 611(a), and a trial judge "may actively participate and give its own impressions of the evidence or question witnesses, as an aid to the jury, so long as it does not step across the line and become an advocate for one side." *Filani,* 74 F.3d at 385.

The trial-management authority entrusted to district courts includes "the discretion to place reasonable limits on the presentation of evidence." *United States v. Ford,* 88 F.3d 1350, 1362 (4th Cir.1996) (citing *United States v. Hassan El,* 5 F.3d 726, 731 (4th Cir.1993)). The exercise of that discretion, however, must remain tethered in some way to the facts and circumstances of the case presented. Accordingly, when confronted with an evasive witness, trial judges must be careful to safeguard the witness's ability to answer questions, particularly in the case of a criminal defendant-witness. In such cases a trial judge should allow for complete answers by a defendant, whether during cross-examination or during redirect.

When faced with the competing interests of effective cross-examination and a criminal defendant's right to testify fully, trial courts provide an essential bal-ancing function: "Accommodating conflicts between the defendant's interest in testifying and the need to [e]nsure truth through cross-examination is one of the trial judge's most important functions. Just as the judge necessarily has discretion to control the form and scope of cross-examination, so he must have discretion to order a witness to answer a proper question." *United States v. Panza,* 612 F.2d 432, 438–39 (9th Cir.1980) (affirming decision striking defendant's direct testimony where he refused to answer questions posed on cross-examination).

We have reviewed all of defendant's contentions carefully. We see no need to parse them out at this time as a new trial before a different judge is the end result. We are confident that the new judge will exercise the appropriate discretion in balancing the competing interests of an orderly presentation of evidence and defendant's right to raise a defense.

## IV. Quattrone's Challenges to Evidence Admitted

Quattrone raises two additional evidentiary issues. First, Quattrone contends that the government improperly cross-examined him with regard to a fee dispute between the Tech Group and Research in Motion, Inc. ("RIM"). Quattrone argues that the government failed to establish the relevance of the evidence under either Federal Rule of Evidence 404(b) as evidence of a prior bad act or under Federal Rule of 608(b) as evidence of a specific instance of misconduct. Appellant Br. 71–77; Reply Br. 37. He also contends that even if the RIM inquiry was relevant, it should have been excluded under Rule 403 as unfairly prejudicial because the government's questioning and subsequent written submissions clearly indicate that the purpose of the RIM inquiry was to signal to the jury that Quattrone

violated SEC disclosure rules by engaging in a secret underwriting fee agreement with RIM that should have been disclosed to investors. Appellant Br. 79–80. Second, Quattrone contests the evidence introduced regarding his compensation from CSFB during 1999 and 2000 as irrelevant and highly prejudicial because it allowed the jury to engage in class prejudice to convict him. Appellant Br. 81–85; Reply Br. 40–42.

The government submits that it offered the RIM evidence for the purpose of impeaching Quattrone's credibility by contradicting his testimony that the RIM matter involved a simple fee dispute. Appellee Br. 93–94. Asserting that the RIM inquiry was admissible for the independent purpose of establishing Quattrone's state of mind at the time that he sent the Endorsement Email, the government claims that it never argued that Quattrone engaged in a violation of the securities laws and that the inquiry was not unfairly prejudicial. *Id.* Regarding the evidence of Quattrone's compensation, the government contends that the compensation evidence tended to establish his motive to maintain his status at CSFB and to obstruct the potentially damaging grand jury and SEC investigations. Appellee Br. 96–97. Furthermore, the government argues that the evidence was not unfairly prejudicial because of the circumscribed purpose for which the government introduced it.

### A. RIM

In October 2000, "RIM completed a $612 million public offering of common stock," which was "underwritten by a syndicate ... that included Merrill Lynch & Co. ... and ... CSFB." J.A. 1090. In a November 2, 2000, email to RIM's CEO, Quattrone claimed that RIM's CEO had promised him that RIM would guarantee CSFB twenty-five percent of all underwriting fees generated by the syndicate. J.A. 1093. Because CSFB's fees amounted only to about 15.7% of the fees, Quattrone sought the difference necessary to reach a twenty-five percent fee, $2.2 million above what had been paid. J.A. 1093. While RIM initially resisted making the payment to the Tech Group, RIM eventually paid it two-million dollars. J.A. 1094.

During the presentation of Quattrone's case, the defense introduced a series of emails spanning fifty minutes that were sent by Quattrone on December 5, 2000, around the time of the Endorsement Email. J.A. 420–23 (Tr. 1880–92). The purpose of the emails was to establish that prior to, during, and after sending the Endorsement Email, Quattrone was besieged with a constant stream of matters while attempting to get home for dinner with his family. *See* J.A. 421 (Tr. 1882–83). Defense counsel argued that the exhibits provided the most direct evidence of Quattrone's state of mind at the time he sent the Endorsement Email at 6:28 p.m. The RIM email was sent by Quattrone immediately after the Endorsement Email, asking "what do we need to do to collect our 2mm?" J.A. 768. Defense counsel argued to the trial court that the emails showed "his mind going boom, boom, boom, boom, boom, right around the time that ends up with this e-mail that the government contends is a crime." J.A. 421 (Tr. 1882).

Thereafter, the government alerted the court and counsel that it intended to cross-examine Quattrone regarding the substance of Quattrone's understanding of CSFB's fee agreement with RIM. J.A. 493–95 (Tr. 2168–2175). The government argued that inquiring into the facts underlying the RIM fee collection would establish that Quattrone was not simply dashing off emails in attempt to get home without thinking. It contended that the RIM

transaction "involve[d] what arguably [was] misconduct." J.A. 494 (Tr. 2171). During cross-examination, the government questioned Quattrone about the basis for seeking the two-million dollar fee. In the course of doing so, the government asked damaging questions intimating that perhaps Quattrone had run afoul of the securities laws because the compensation was not disclosed in RIM's SEC filings. *See* J.A. 496–97 (Tr. 2179–82) ("And you know that when there's secret undisclosed compensation, that's a violation of the securities laws, right?").

We agree with the government that the inquiry into RIM was relevant both to impeaching Quattrone's credibility and to establishing Quattrone's state of mind at the time he sent the Endorsement Email. Quattrone's theory of the case focused in part on his contention that he was frantically attempting to leave work in order to meet family obligations. Consistent with this contention, the defense introduced the series of emails sent by Quattrone immediately before he left, including both the Endorsement Email and the email referring to RIM. The government's questioning regarding whether the RIM

collection matter was in fact "ordinary" could add to the body of circumstantial evidence establishing Quattrone's wrongful intent and might discredit an important aspect of the defense's theory of the case. Thus, the questioning satisfied the threshold relevancy requirement of Rule 401.[31]

But our inquiry does not end here. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." FED. R. EVID. 403.[32] The evidence regarding RIM was probative of whether Quattrone was simply clearing his desk to get home early from work or, instead, had been contemplating significant, serious issues at almost the same time when he sent the Endorsement Email. Equally important, the line of inferences flowing from the RIM email contradicted part of the defense's theory of the case and the characterization by Quattrone that the email was about a simple collection matter. Thus, there was significant probative value to the email.

However, the manner of questioning by the government gave rise to the potential

---

**31.** We disagree with Quattrone's counsel that the inquiry regarding the RIM transaction could be permissible under only Rule 404(b) as a prior bad act indicative of intent or under Rule 608(b) as an inquiry into specific instances of misconduct. The line of questioning was relevant to impeach Quattrone's credibility by contradicting the implicit assertion that the RIM email was just one in a series of insignificant emails in an effort to tie up loose ends before Quattrone headed home for the day. Because the RIM email was sent two minutes after the Endorsement Email, it is also relevant to Quattrone's state of mind around the time he sent the Endorsement Email.

**32.** We reject Quattrone's argument that the district court committed reversible error by failing to engage in a balancing of the preju-

dice caused by the line of inquiry against the probative value garnered from it. Here, there is nothing in the record affirmatively suggesting that the district court failed to exercise its discretion, and the trial court appropriately responded to the substance of the objections raised by trial counsel. *Cf. Leopold v. Baccarat, Inc.*, 174 F.3d 261, 269 n. 11 (2d Cir. 1999) (rejecting contention that district court's 403 determination not due ordinary deference absent affirmative indication in record of failure to exercise discretion properly); *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.1980) (noting significance of trial court's error in expressing that all evidence introduced against a criminal defendant was prejudicial so that the sole issue becomes the probative value of the evidence to be admitted).

for unfair prejudice to Quattrone.[33] We have had occasion to discuss the meaning of "unfair prejudice" as used in Rule 403:

All evidence introduced against a defendant, if material to an issue in the case, tends to prove guilt, but is not necessarily prejudicial in any sense that matters to the rules of evidence. *See United States v. Briggs*, 457 F.2d 908, 911 [(2d Cir.1972)] .... Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence. *See* Advisory Committee Note to Rule 403; S. Saltzburg And K. Redden, Federal Rules Of Evidence Manual 43 (2d ed. 1978 Supp.). The prejudicial effect may be created by the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant.... When material evidence has an additional prejudicial effect, Rule 403 requires the trial court to make a conscientious assessment of whether the probative value of the evidence on a disputed issue in the case is substantially outweighed by the prejudicial tendency of the evidence to have some other adverse effect upon the defendant.

*United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.1980). That is to say, the prejudice undercutting a particular piece of evidence does not arise out of the rationale that justified its admission into evidence. Instead, the prejudice must be unfair in the sense that it could unduly inflame the passion of the jury, confuse the issues before the jury, or inappropriately lead the jury to convict on the basis of conduct not at issue in the trial. *See* Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 94, at 486–498 (2d ed.1994).

Establishing that Quattrone contemplated significant, important issues around the time that he sent the Endorsement Email provided the justification for the government's RIM inquiry. The evidence on that point also contradicted Quattrone's testimony to the extent that he implied that the RIM fee dispute was a simple matter. Appellee Br. 93–94. However, even a cursory reading of the record establishes that the government's questions quickly focused on a suggestion that Quattrone had failed to disclose information required by SEC regulations. *See* J.A. 496–97 (Tr. 2179–82), *supra*. Despite the government's representations at oral argument, the unavoidable consequence of this inap-

---

**33.** We set out a sample of the government's questioning:

Q. And the SEC and the NASD, you understood, have rules requiring that disclosure, right?
A. Correct.
....
Q. And you understood that investors need to know this information so they could determine how much of their money is going to the company when they invest and how much is going to the underwriters, right?
A. That's right.
Q. And the SEC requires this ... right on the cover of the prospectus, right?
A. The total compensation to the underwriters.

Q. And you know that when there's secret undisclosed compensation, that's a violation of the securities laws, right?
A. It could be, yes.
....
Q. This agreement wasn't in writing anywhere, right?
A. No.
....
Q. It wasn't disclosed to the SEC .... NASD .... [or] to investors who purchased these securities, right?
A. That's right.
J.A. 496–497 (Tr. 2179–82).

propriate suggestion was that Quattrone had likely run afoul of an SEC mandate. Moreover, the SEC investigation was a critical focal point of the government's charges. Simply put, the line of questioning went too far. Once the government sought to make the RIM matter a bad act involving a violation of SEC regulations, neither established nor charged, it created the prospect that the jury might view the RIM evidence as further proof of Quattrone's desire to obstruct the SEC in the pursuit of its regulatory responsibilities. While it may be the case that the RIM email reflects other culpable acts, those acts were not part of the charges brought against Quattrone.

## B. Evidence of Quattrone's Compensation

 The government offered evidence of Quattrone's salary during 1999 and 2000 in order to argue that Quattrone's substantial salary established a motive for him to obstruct the IPO allocation investigations. Quattrone contends that the evidence was irrelevant and unduly prejudicial because it invited the jury to engage in class-based bias against him. To this end, Quattrone asserts that evidence of wealth is always irrelevant to motivation. In our view, the district court acted within the scope of its discretion in finding the evidence relevant and consistent with Rule 403. *See United States v. Logan*, 250 F.3d 350, 369 (6th Cir.2001); *United States v. Mitchell*, 172 F.3d 1104, 1108–10 (9th Cir.1999); *United States v. Weiss*, 914 F.2d 1514, 1523–24 (2d Cir. 1990); *United States v. Stahl*, 616 F.2d 30, 32–33 (2d Cir.1980). While evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations, that evidence may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth.

*Compare, e.g., Logan*, 250 F.3d at 369 (approving of inquiry into income from company used to conduct fraud as evidence of motive to falsify information submitted to government-backed entity over Rule 403 challenge), *with Stahl*, 616 F.2d at 32–33 (overturning conviction on ground of undue prejudice and misconduct in bribery prosecution when prosecutor made repeated inflammatory references to wealth during opening and summation).

We cannot say that the district court acted so far outside the range of reasonable decision making in admitting this evidence that it abused its discretion. The district court concluded that evidence of Quattrone's compensation for 1999 and 2000 was relevant to Quattrone's motive to protect his reputation and that of CSFB's Tech group. Despite Quattrone's protests to the contrary, the compensation evidence was not unduly prejudicial. As the government highlights, its references to Quattrone's compensation during its opening statement and summation specified that evidence of his compensation was to be used for the limited purpose of establishing a motive to obstruct and could not be used to convict Quattrone simply because of his wealth. Appellee Br. 96–97.

## V. Quattrone's Challenges to Evidence Excluded

 Quattrone next challenges the district court's exclusion of evidence relating to events occurring after the Endorsement Email, internal discussions among LCD attorneys about whether to issue broad document-preservation notices, and emails by Quattrone tending to establish a practice of responding to subordinate's emails by endorsing their actions.

## A. Events Subsequent to December 2000

Quattrone argues that because the district court allowed the government to in-

troduce his false exculpatory statement of January 2003 to Lynch, Quattrone should have been allowed to introduce evidence of events occurring during the two-year interim between December 2000 and January 2003 that explain how Quattrone could be mistaken when he told Lynch in 2003 that he was not aware of the grand jury investigation in late 2000. Specifically, Quattrone sought to offer evidence that he was not reprimanded by his employer, had been promoted to its executive board, had not been called as a witness or interviewed in connection with the grand jury or SEC investigations, and that the investigations ended without criminal charges being filed against CSFB or its employees. *See* Appellant Br. 85–90; Reply Br. 43. The government counters that Quattrone succeeded in introducing evidence supporting his contention that he was mistaken and asserts that the remaining evidence was properly excluded under Rule 403.[34] Appellee Br. 103. Quattrone points out that the district court excluded the evidence only on relevance grounds. Reply Br. 43 (citing J.A. 142, 430–31, 499 (Tr. 783–85, 1918–24, 2191–92)).

■ Although appellate review of evidentiary determinations is extremely deferential, *see e.g.*, *United States v. Malpeso*, 115 F.3d 155, 162 (2d Cir.1997), the district court incorrectly concluded that the evidence proffered by Quattrone was not relevant to a fact of consequence in the case. The threshold relevance inquiry requires only that evidence have some tendency to make a fact of consequence "more or less probable than it would be without the evidence." FED. R. EVID. 401. In deter-

mining the relevance of circumstantial evidence, it will often be useful to consider the chain of inferences arising from proffered evidence. Under this test, so long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry. *See United States v. Ravich*, 421 F.2d 1196, 1204 n. 10 (2d Cir.1970) (Friendly, J.) (rejecting common law "inference upon inference" test and noting that drawn out inferential chains do not defeat relevance but subject challenged evidence to Rule 403 considerations).

Here, we conclude that the evidence did have a tendency to make more or less probable the fact that Quattrone was simply mistaken when he misspoke to Lynch. The government's theory of the misstatement was that it was an intentionally false exculpatory statement and was therefore relevant to show Quattrone's guilt. The evidence Quattrone offered related to the question of whether it would be reasonable for Quattrone to forget about the investigation over the two-plus years after December 2000. The inferences to be drawn from the evidence would run as follows: after the Endorsement Email, Quattrone received no indication that the investigations were important; he could have concluded that the investigations were unimportant; unimportant events are sometimes forgotten; Quattrone forgot about the investigations; Quattrone therefore had an innocent reason for the misrepresentation; when Quattrone made the misrepresentation, he was merely mis-

---

**34.** Quattrone testified that when he spoke to Lynch, he was home ill and made his statement to Lynch "based on the advice" he "had gotten from Mr. Dollard after having forgotten the sequence of events." J.A. 433 (Tr. 1930–31). Dollard, the Tech Group lawyer, had refreshed Quattrone's memory a few months prior to January 2003. Dollard testified that he had told Quattrone that the Palo Alto CSFB office had not been aware of the investigations. J.A. 338 (Tr. 1553). In addition, Brodsky testified that he did not believe that Quattrone was "in trouble" when he sent the Endorsement Email. J.A. 291 (Tr. 1371).

taken, not lying. Of course, this line of reasoning is attenuated and open to attack due to reliance on inductive reasoning. *See* MUELLER & KIRKPATRICK, *supra*, § 83, at 409–411 & nn. 47–48. But that is a question generally to be addressed by the Rule 403 balancing test. And while that balancing test need not always be explicitly set out by the trial judge, the record makes clear that the trial judge excluded the evidence solely at the threshold relevance determination. *See* J.A. 141–42; 430–31; 499 (Tr. 783–85; 1918–24; 2191–92). Accordingly, it was error to exclude this evidence as irrelevant.

Although the error may have been harmless—Quattrone was able to introduce his testimony and corroborative testimony from Dollard that Quattrone innocently forgot about the investigations because he was ill and had been wrongly informed by Dollard—the matter may once again be before the district court on retrial.[35] Accordingly, there is no need for us to adjudicate the question. We note the court's error here only to caution the district court to consider the prejudicial offset of this evidence against its probative value before making a decision to accept or reject the evidence.

## B. Evidence of Discussions Among LCD Lawyers

■ Quattrone next argues that he should have been permitted to introduce evidence regarding LCD's internal discussions concerning distribution of broad document preservation notices.[36] Quattrone presses that this evidence should have been admitted on four grounds. First, he contends that it bore on the reasonableness of his actions, *i.e.*, in the absence of document preservation notices, it was proper to encourage employees to follow normal document destruction practices. Appellant Br. 92–93. Second, Quattrone argues that the excluded evidence would have allowed him to contest testimony of Brodsky and McCarthy [37] that suggested (in Quattrone's view) that Quattrone should have known that the Endorsement Email was improper. Appellant Br. 93–94 (citing J.A. 216, 255–56; 322–23). Third, he argues that the evidence bore on the credibility of Quattrone's defense because "[i]f the lawyers with perfect knowledge of the subpoenas had concluded that preservation notices should be sent on only *two* IPOs, then why should Quattrone have known that documents on *hundreds* of IPOs had to be preserved?" Appellant Br. 94. Finally, Quattrone claims that the excluded evidence would have allowed him to argue more effectively that "he should not be held personally accountable for CSFB's failure to ensure that documents were preserved as required by the government's subpoenas." Appellant Br. 94–95.

The government responds that communications among LCD lawyers have no bearing on Quattrone's Endorsement

---

**35.** More importantly, the evidence sought to be admitted offered extremely little probative value while running the risk of leaving the jury with the misimpression that no crime could have occurred because no charges arose directly out of the investigations.

**36.** The proof would have included evidence that LCD personnel debated whether to send document preservation notices to all Tech Group lawyers in September 2000; that outside counsel indicated to LCD that preservation notices had to be sent for all requested IPOs; that LCD never sent broad preservation notices because it feared a leak; that LCD received Char's December 4, 2000, email prior to Quattrone's email and debated whether to send an immediate preservation notice; and that LCD's failure to send a preservation notice was contrary to its practice. Appellant Br. 91–92.

**37.** McCarthy was a lawyer with CSFB's LCD.

Email when Quattrone knew that the grand jury and SEC investigations called for documents related to the allocation process. Appellee Br. 106. Second, the government argues that McCarthy and Brodsky were cross-examined extensively on the document-preservation policy and the failure to send document preservation notices regarding broad categories of documents. Appellee Br. 106 (citing A 213–14; A 281–82, 287 (Tr. 1063–66; 1329–32; 1352–55)). Third, the government presses that Quattrone's proffered evidence was completely irrelevant because uncommunicated, internal deliberations not involving Quattrone have no bearing on Quattrone's actions. Appellee Br. 107. Finally, the government argues that Quattrone's last contention highlights his attempt to blame others for his conduct, while the government's case was based upon Quattrone's actual knowledge of the subpoenas passed to him by others. Appellee Br. 107.

The district court did not abuse its discretion in excluding this evidence. Quattrone seeks in essence to absolve himself from liability arising from the Endorsement Email because CSFB attorneys did not stay CSFB's document-retention/destruction policy. None of the LCD discussions with regard to document preservation notices were ever communicated to Quattrone. The case was tried on the theory that when Quattrone became aware of the investigations he wrongfully intended to obstruct justice and to engage in witness tampering. The fact that others, notably CSFB's in-house counsel, did not issue document-preservation notices could not absolve Quattrone from criminal liability. The asserted misfeasance of CSFB's attorneys is not a defense to criminal liability for Quattrone's knowing attempt to thwart two investigations.

We also reject the contention that the internal deliberations of LCD lawyers were relevant to combat unfair impres-

sions left with the jury by Brodsky and McCarthy that someone in Quattrone's position, who claimed that he thought the investigations related to another business area of the bank, should have realized that the investigations called for Tech Group documents. Appellant Br. 94. The record belies Quattrone's assertion. McCarthy testified, as did Quattrone, that CSFB bankers would not have a duty to preserve documents (absent a preservation notice) if they were unaware that litigation or a subpoena called for specific documents. *See* J.A. 213 (Tr. 1065). Additionally, Brodsky testified that there was no broad document-retention notice sent out until December 7, 2000, and that Quattrone had not seen the relevant subpoenas. J.A. 287 (Tr. 1352–55). Brodsky also testified that he believed that Quattrone had not done anything wrong when he sent the Endorsement Email. J.A. 291 (Tr. 1371).

Lastly, the evidence of alleged misfeasance by CSFB's LCD attorneys, if any, would have no bearing on the question of whether Quattrone, who was aware of the investigations, acted with innocent or with wrongful intent. The district court was confronted with the rare instance where the logical relationship between the evidence to be offered—LCD's internal, uncommunicated discussions—and the conclusion to be reached—Quattrone's innocent *mens rea*—would be stretched to the point where a trial court could conclude within the exercise of its discretion that the evidence did not have any tendency to make more or less probable the fact of consequence. *See* MUELLER & KIRKPATRICK, *supra*, § 83, at 410–11. Accordingly, we see no error in the exclusion of the internal deliberation of LCD lawyers.

## C. Evidence of Other Reinforcing Emails

██ Quattrone also questions the exclusion of what he terms "evidence of simi-

lar reinforcing emails" to establish that Quattrone had a practice of responding to (or forwarding on) emails from subordinates in an attempt to achieve compliance with CSFB directives. Appellant Br. 95–97; Reply Br. 48–49. Quattrone argues that the evidence [38] should have been admitted pursuant to Federal Rule of Evidence 404(b) as proof of prior acts in order to establish Quattrone's innocent intent. Specifically, Quattrone contends that his prior acts were relevant to establish that when he sent the Endorsement Email roughly twenty-four hours after beginning to draft his response, he did not act with deliberate, corrupt intent. Instead, he merely reinforced the message of a fellow employee: follow the document retention policy. The district court excluded the evidence on the ground that the emails were insufficient to establish within the meaning of Federal Rule of Evidence 406 a habit of reflexively responding to subordinates' email suggestions.

Rule 404(b) "deals with a specialized but important application of the general rule excluding circumstantial use of character evidence. Consistently with that rule, [*i.e.* Rule 404(a),] evidence of other crimes, wrongs, or acts is not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it [in essence propensity reasoning]. However, the evidence may be offered for another purpose, such as proof of motive, [intent,] opportunity, and so on, which does not fall within the prohibition." Fed. R. Evid 404, Adv.

Cmte Notes, 1972 Proposed Rules, Note to Subd. (b). While prosecutors generally employ prior bad acts evidence, sometimes defense counsel seize upon the standard to admit useful prior act evidence. *See, e.g., id.,* Adv. Cmte. Notes, 1991 Amendments. To be admissible under Rule 404(b) the evidence must serve a non-propensity purpose. *See, e.g., United States v. Aboumoussallem,* 726 F.2d 906, 911–12 (2d Cir. 1984) (evidence that co-conspirators had duped other couriers into carrying drugs admissible to prove defendant was duped where charge was knowingly importing drugs, subject to Rule 403 balancing).

■■■■ We conclude that because the similar reinforcing emails were not competent Rule 404(b) evidence, the trial court did not err in excluding them.[39] Quattrone seeks to justify the emails on the basis that they establish his intent and disavows that the evidence is relevant only for propensity purposes. But propensity would be the only basis for justifying the evidence. The emails relate to Quattrone's intent only if one could infer that Quattrone acted in conformity with past patterns of shooting off quick emails to subordinates. The inference, of course, is that Quattrone must have done so for innocent purposes. This is a clear example of the propensity reasoning that Rule 404(a) prevents. Dubbing the emails circumstantial evidence of Quattrone's intent merely obfuscates the analysis—they are relevant only if an inference is drawn that Quat-

---

**38.** The evidence consisted of fifteen emails sent by Quattrone between May 17, 1999, and December 15, 2001. *See* Mem. of Law in Supp. of Def. Frank Quattrone's Mot. for Admis. of Evidence Showing His Lack of Criminal Intent, at 3–4 (Apr. 23, 2004) (Docket Entry No. 104), mem. reproduced at J.A. 985–996. Some of the emails were sent after the December 5, 2000, Endorsement Email.

**39.** The emails would not be admissible as character evidence because of the bar on proving character other than through opinion or reputation, except where character is an element of a claim, charge, or defense. *See* Fed.R.Evid. 404(a); 405(a).

trone acted in conformity with a character trait or habit.[40]

## VI. Remand to Another Judge

■ Quattrone's final request is that any further proceedings below be reassigned to a different judge. Quattrone contends that the trial judge is no longer impartial with regard to his case and that "numerous [media] observers have already questioned the impartiality of the district court." Appellant Br. 101 (footnote omitted). The government counters that Quattrone's claims are insufficient to meet the standard necessitating remand to another judge and argues forcefully that Quattrone's complaints are based upon a media campaign orchestrated to present the trial judge in a negative light. Appellee Br. 122. Furthermore, the government argues that certain remarks by the court that could be considered "intemperate" are insufficient grounds for reassignment and notes that this is Quattrone's third attempt to obtain a new trial judge. Appellee Br. 122–23. While we question the significance of the "numerous observers[']" accounts cited by Quattrone's counsel,[41] we ultimately conclude that on remand the interests of all involved would best be served by another judge. We further note

that our action "does not imply any personal criticism of the trial ... judge." *United States v. Robin*, 553 F.2d 8, 10 (2d Cir.1977) (per curiam) (denial of rehearing en banc).

■ In order "[t]o reassign a case on remand, we [must] find that 'the facts might reasonably cause an objective observer to question [the judge's] impartiality.'" *U.S. v. Londono*, 100 F.3d 236, 242 (2d Cir.1996) (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 21 (2d Cir.1996)) (alteration in original). Yet we may also remand to another judge absent such proof of partiality where "reassignment is advisable to preserve the appearance of justice." *Robin*, 553 F.2d at 10 (discussing standard as factor but characterized as separate ground for remand in *Londono*).

This case has already endured two full trials before the same dedicated jurist. In our view, the contentions of the parties in this difficult and complex matter have taken a toll on all involved. We conclude that the better decision is that the case be reassigned to another judge upon remand. While we have considered the government's arguments and do not find evidence that the trial judge made any inappropriate statements leading us to seriously

---

**40.** We note that Quattrone is correct to abandon on appeal his claim that the emails established a habit he acted upon. A day elapsed between when Quattrone began drafting the Endorsement Email and when he sent it. The trial court correctly ruled the email was not a reflexive response to a repeated, specific situation. *See* Fed. R. Evid. 406 & Adv. Cmte. Notes, 1972 Proposed Rules.

**41.** In attempting to argue that numerous media commentators noted the allegedly biased conduct of the trial court judge, Quattrone cites only one newspaper article in the text of his Opening Brief though he collects others in a footnote. Appellant Br. 101 & n. 38. However, the very article that Quattrone employs to establish improprieties has at least one

material mischaracterization of the court's trial management. The article claims that Brodsky testified upon cross-examination "No" when asked "Did you think he [Quattrone] had done anything wrong?" *See* Andrew Ross Sorkin, *A Shift in Testimony in Ex–Banker's Trial*, N.Y. Times, Apr. 23, 2004, at C3. This characterization was completely accurate. *See* J.A. 291 (Tr. 1371). What was inaccurate, however, was the next sentence of the article: "The judge ... immediately struck the answer from the record ...." Sorkin, *supra*, at C3. The record clearly reflects that upon objection, the trial judge allowed Brodsky to testify "No" but instructed the witness to move on without providing further commentary. J.A. 291 (Tr. 1370–71).

doubt his impartiality, portions of the transcript raise the concern that certain comments could be viewed as rising beyond mere impatience or annoyance. Ultimately we believe that the interest and appearance of justice are better served by reassignment.

## Conclusion

The district court's judgment of conviction dated September 16, 2004, is hereby VACATED, and the case REMANDED for retrial. The case shall be assigned to another district court judge sitting in the United States District Court for the Southern District of New York. Appellant's November 15, 2004 motion to inspect a juror's post-trial letter to the district court is hereby DISMISSED as moot.